IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RACINE CAR DEALER, LLC,

                              Plaintiff,                        OPINION AND ORDER

    v.
                                                                              22-cv-322-wmc

HYUNDAI MOTOR AMERICA[1] and
GENESIS MOTOR AMERICA, LLC,

                              Defendants.

In the last decade, the distribution of automobiles in the United States has begun to undergo a sea change with large, multi-franchise dealerships buying up smaller, local dealers for whom protective state and federal dealer laws were originally enacted, primarily driven by economies of scale, internet marketing, narrowing profit margins, tightening inventory, incentive programs, demographics, international competition, the pandemic and direct-to-consumer sales. *See* Paige Hodder, "Costs and time impact dealership consolidation," *Automotive News*, Oct. 26, 2023, https://www.autonews.com/retail/car-dealership-consolidation-costs-buying-and-growing#:~:text=Large%20dealership%20groups%20on%20Automotive,from%2022.7%20percent%20for%202021); S. Inampuidi, et. al., "As dramatic disruption come to automotive showrooms, proactive dealers can benefit greatly," *McKiney & Company,* https://www.mckinsey.com/industries/ automotive-and-assembly/our-insights/as-dramatic-disruption-comes-to-automotive-showrooms-proactive-dealers-can-benefit-greatly; Kevin Gordon, "Industry Consolidation, and Why It's

---

[1] While the complaint purports to name "Hyundai Motor America Corporation" as a defendant, that defendant's Disclosure of Corporate Affiliations and Financial Interest form (dkt. #6) states its corporate name is actually "Hyundai Motor America." Therefore, the court has revised the caption to reflect this name.

Happening," *Auto Remarketing*, Aug. 3, 2015, https://www.autoremarketing.com/guest_content/industry-consolidation-and-why-its-happening/); Evan Hirsch, et. al., "Changing Channels In The Automotive Industry: The Future of Automotive Marketing and Distribution," *Strategy & Business*, First Quarter 1999/Issue 14, https://www.strategy-business.com/article/10102.  Unsurprisingly, this change has also given rise to growing legal disputes between automobile manufacturers and downstream dealers.

In this lawsuit, plaintiff Racine Car Dealer, LLC ("RCD"), a former Hyundai and Genesis motor vehicle dealer in Mount Pleasant, Wisconsin, asserts 10 claims against 2 motor vehicle distributors -- defendants Hyundai Motor America ("HMA") and Genesis Motor America, LLC ("GMA") -- under several provisions of the Wisconsin Motor Vehicle Dealer Law ("WMVDL"), the Federal Automobile Dealer's Day in Court Act ("ADDCA"), the Wisconsin Fair Dealership Law ("WFDL"), and Wisconsin contract law.  Although legally distinct, all of RCD's claims arise out of the same, core allegations that defendants withheld information, misled RCD, and changed dealer incentive program rules and policies without notice in a concerted effort to force RCD to terminate its Genesis vehicle dealership, as well as force an acquiring dealer to build a separate and exclusive facility for the Genesis dealership in Racine, Wisconsin.  Specifically, RCD alleges that defendants knowingly waited until a few days before RCD was set to close on the sale of its Hyundai and Genesis dealerships to a third party, Zieglar Auto Group, to advise that it could not approve that sale as negotiated because Ziegler would not be eligible to receive valuable incentive payments going forward unless RCD either (1) terminated its Genesis dealership, or (2) moved the Genesis franchise to a separate facility.  As a result, RCD alleges that it

had no choice but to terminate its Genesis dealership, which led to a $2 million reduction in the overall sale price for the assets of a group of other dealerships, including Hyundai.

The following motions are now pending before the court:  (1) plaintiff's motion for leave to amend its complaint (dkt. #47); (2) defendants' motions for summary judgment as to all claims (dkt. ##19 and 28); and (3) plaintiff's motion for partial summary judgment on its claim nos. 1-4 and 10 (dkt. #30).  *First*, RCD seeks to amend its complaint to:  (1) dismiss voluntarily its WMVDL retaliation claim under Wis. Stat. § 218.0116(1)(z) (Count V) and its WFDL alteration of dealership claim under Wis. Stat. § 135.03 (Count VIII); and (2) in the event that the court finds the incentive agreement to be an illusory and unenforceable contract, allow RCD to add alternative causes of action for misrepresentation, promissory estoppel, and unconscionable practices in violation of Wis. Stat. § 218.0116(1)(f).  (*See* Amd. Cpt. (dkt. #47) at 26-27 and 30-31.)  For the reasons explained below, the court concludes that the incentive agreement is an enforceable contract, and therefore, it is both unnecessary and too late for RCD to plead alternative, new causes of action sounding in tort in the lawsuit.  Accordingly, the court will deny RCD's motion to amend while granting the request to dismiss its retaliation and WFDL claims voluntarily.

*Second*, with respect to the merits of RCD's remaining claims, defendants contend that:  (1) the mutual release agreements that RCD executed with HMA and GMA bar all of RCD's claims; (2) GMA should be dismissed because all of RCD's claims are predicated on HMA's conduct, and RCD has failed to show that HMA's actions can be attributed to GMA; and (3) RCD has not established a basis to hold HMA liable under any legal theory.

3

For reasons also explained below, the court further concludes that the mutual releases do not bar RCD's remaining claims in this case, and there are genuine issues of material fact as to HMA's conduct and the circumstances surrounding the incentive program. Accordingly, the court will deny RCD's motion and deny HMA's motion, except as to the following two claims:  (1) the Wis. Stat. § 218.0116(1)(Lm) claim based on HMA's failure to comply with the timing requirements in Wis. Stat. § 218.0134(2)(a); and (2) the claim for HMA's intentional interference with contract.  However, because RCD has failed to present a legally sufficient basis for holding GMA liable for HMA's actions, the court will grant GMA's motion for summary judgment on the claims asserted against it.  Accordingly, this case will proceed to jury trial on January 22, 2024, on the remaining claims against HMA alone.

UNDISPUTED FACTS[2]

## A. The Parties and Key Players

Plaintiff RCD is a licensed motor vehicle dealer and a Wisconsin limited liability company with its main office located in Janesville, Wisconsin.  Among other things, RCD

---

[2] The following facts are drawn from the parties' proposed findings of facts and responses, and they are undisputed except where noted.  The court notes that RCD has objected to several of defendants' proposed findings of fact on the ground that they cite emails for which defendants failed to provide any foundation or corroborating affidavits.  (*E.g.*, RCD's resp. to DPFOF ¶¶ 16-17, dkt. #56, at 13-14.)  However, most of the emails are offered to show notice or knowledge, not for the truth of the matter asserted within them.  Additionally, the court may consider the content of the emails because it is obvious that defendants would be able to present the evidence in admissible form at trial through live witness testimony.  *Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002).  The court also finds no merit to defendants' arguments that Bozich's affidavit should be disregarded as self-serving and contradicted by evidence of record, since neither is a sound basis for rejection given conflicting evidence in this record at summary judgment.

4

owned and operated the business known as "Racine Hyundai," which held a valid Hyundai motor vehicle dealership from approximately January 2014 to July 2021, and a valid Genesis motor vehicle dealership from approximately February 2019 to July 2021.  Both dealerships operated out of the same facility in Mount Pleasant, Wisconsin.  James Bozich has been an owner and the managing member of RCD since the company was organized in July 2013.  When Bozich moved to Hawaii on a part-time basis in 2018, Adrian Basich began acting as "general manager" for day-to-day matters, but Bozich remained the owner and manager of record and retained decision-making authority for both dealerships.

Defendants HMA and GMA are licensed motor vehicle distributors under the WMVDL.  HMA is also a subsidiary of Hyundai Motor Company ("HMC"), which manufactures both Hyundai and Genesis motor vehicles.  HMA is the sole distributor of Hyundai vehicles in the United States; it also distributed Genesis vehicles, until its subsidiary, GMA, was formed in November 2016 *and* became the sole distributor of Genesis vehicles in the United States.  Since at least 2016, Bozich's primary contact at HMA was Guy Warner, a senior regional marketing representative.

### B. RCD's Dealership Agreements

#### 1. Initial Hyundai Dealership

On January 2, 2014, RCD and HMA executed a Hyundai Motor America Dealer Sales and Service Agreement ("HMA dealer agreement"), authorizing RCD to buy, sell, promote, and service Hyundai products, which also included the Genesis model vehicles. In November 2016, HMA formed GMA to create a separate and distinct American corporation for the distributorship of Genesis-branded vehicles.  Around this same time,

RCD began discussions with HMA about relocating its Racine Hyundai dealership, where it sold both Hyundai and Genesis model vehicles, to a new facility about one mile from its current location.

On May 16, 2017, RCD signed an amendment to its HMA dealer agreement approving this new facility, and by the fall of 2017, RCD had purchased land and constructed an entirely new dealership facility that complied with HMA's then applicable Global Dealership Space Identity ("GDSI") standards.  To provide RCD with financial assistance in completing these branding upgrades, RCD and HMA also executed a Facility Assistance Agreement on May 18, 2017.  That agreement required RCD to comply with exclusivity requirements for 48 months, meaning that it could sell only Hyundai vehicles until June 30, 2021, which still included the Genesis model.

### 2.  Creation of Separate Genesis Brand Dealership

By early 2018, Bozich began hearing rumors that Hyundai was considering breaking off its Genesis model vehicles into separate dealerships, authorizing only a limited number of new dealers nationwide.  RCD was concerned, because it was not a large dealer in a large market area, until HMA and GMA announced on September 20, 2018, that:  (1) *all* existing Hyundai dealers would be offered a separate, GMA dealer agreement; and (2) any existing Hyundai dealers that did *not* want to become Genesis dealers would be offered settlement packages based on the number of Genesis vehicles they sold in 2017.

Ultimately, approximately 40 percent of the 800 or so existing Hyundai dealerships, including RCD, accepted the offer to operate a Genesis dealership.[3]

RCD executed its GMA dealer agreement on February 7, 2019, agreeing to a survey of its facility and the latest Genesis interior and exterior branding. Although RCD expressed some concerns about how its new Genesis franchise would affect the exclusivity requirements in its existing HMA dealership and Facility Assistance agreements, Hyundai marketing representatives assured RCD that its dealership would still be considered "exclusive," even though it sold both Hyundai and Genesis branded vehicles out of the same facility. Nor did HMA require RCD to amend its HMA dealer agreement at the time it entered into a separate Genesis dealer agreement, despite contemplating operation of the two dealerships at the same location.

### C. HMA's Accelerate Incentive Program

In October 2019, HMA began telling dealers present at a Hyundai dealer meeting in Las Vegas, Nevada, that it intended to release an incentive program to support dealers who chose to make improvements to their Hyundai facilities. Although HMA invited RCD to the dealer meeting, the parties dispute whether Basich attended it.

A few months later, HMA officially announced the Hyundai Accelerate Brand Program (referred to as the "Accelerate Incentive Program" or "AIP") in an email dated January 10, 2020, which included various attachments regarding the program rules, HMA facility usage policies, and dealer enrollment. However, the parties dispute whether the

---

[3] Had RCD opted instead for the settlement package, Bozich represents that RCD would have been paid a total of $72,249.40.

general manager of record, Bozich, or the acting general manager, Basich, or anyone else at RCD received this announcement.[4]

The AIP incentives were only available to Hyundai dealers who were investing in their facilities and brand.  Moreover, to participate in the AIP, Hyundai dealers were required to sign and return an enrollment form that described the program.  In conjunction with the incentive program, HMA also updated its existing GDSI design standards for Hyundai dealers' "facility branding, signage, and fascia" to comply with GDSI 2.0 standards, which included significantly more design requirements related to the inside of the store, including the showroom, sales office, customer lounge, service drive, and parts department.  In particular, the AIP kick-off letter identified three types of incentive payments based on exclusive representation of Hyundai:  one for commencement of construction; one for completion of construction; and an exclusivity bonus after completion of construction.  The kick-off letter also referred recipients to a link to HMA's updated exclusivity guidelines called "Policy 105."

The kick-off letter further included a copy of a document entitled "Guide 105 – Facilities Usage," dated January 2, 2020, which defined an "exclusive" facility as "a separate and distinct (stand-alone) building or buildings from which only Hyundai sales and service dealership operations [] are conducted," and it required any dealer with a planning guide

---

[4] HMA has presented evidence that Bozich was on the email distribution list, but he avers that the email was sent to an old email address, which had not been used since 2015.  As a result, he never saw it.  Although RCD's Everhart and Basich appear on an undated "Master Dealer Directory" (Dkt. #21-13), they are not included on the "Current Dealer Email List as of 9.2020" (Dkt. #21-20).

("PG") of 350 or above, which included RCD with a PG of 580, to have an exclusive facility. (*See* dkt. #21-12, at 4 and 17.) Still, the guide provided that HMA may grant exceptions based on undefined special circumstances in the dealer's market that are beyond the dealer's control. (*Id*., at 19.) The guide also provided a limited time exception for exclusivity compliance -- through December 31, 2021 -- for dealers who operated a Genesis showroom using Genesis signage and a GPE kit in a Hyundai facility. However, according to Bozich, RCD did not have a GPE kit.

### 1. RCD's Enrollment

On January 14, 2020, Bozich received an email as the manager of record from HMA Senior Regional Marketing Representative Warner, who encouraged RCD to enroll in AIP and explained the money that RCD received could be significant. Further, attached to Warner's email was a five-page enrollment form, entitled "Hyundai Accelerate Brand Program Enrollment – Exclusive GDSI 2.0," which outlined the program rules and procedures. However, the email did not include any of the additional information sent to dealers earlier that month that RDC denies receiving, such as the kick-off letter and Guide 105. After receiving yet another, similar email from Warner, Bozich executed the AIP enrollment form on behalf of RCD on January 31, 2020, specifically agreeing, among other things, to implement the "Exclusive GDSI 2.0" standards at RCD's facility, undergo a facility survey conducted by HMA's authorized vendor, and retain an architect and general contractor to provide building plans for HMA's review and approval.[5] (Dkt. #31-12.)

---

[5] As described above and discussed further below, the parties dispute whether Bozich was adequately informed and agreed to the exclusivity requirements under the Accelerate Incentive

While all development and implementation costs of the Accelerate Incentive Program were to be assumed by RCD, which would in turn receive support payments from HMA based on a percentage of RCD's vehicle margin over a specified period of time, Bozich estimated that RCD would receive more $2,000,000.00 in payments.  Moreover, the enrollment form that Bozich signed repeatedly uses the term "Exclusive GDSI 2.0," but does not define exclusivity or identify facility exclusivity requirements, except for stating in the final paragraph that facility exclusivity is "defined by HMA policy."  (*Id.*, at ¶ 20.)  Finally, on behalf of HMA, Warner did *not* tell Bozich that RCD would have to move any of its Genesis dealer operations to a separate facility away from Hyundai's *or* voluntarily terminate its Genesis operations altogether to qualify for any of these incentive payments.

### 2.  RCD's Compliance with GDSI 2.0

On March 5, 2020, Warner emailed Bozich a compliance checklist that identified what RCD had to do to bring its current facility[6] up to the new GDSI 2.0 standards, as well as a slide show demonstrating the difference between GDSI and GDSI 2.0.  The checklist (and an updated one, emailed on March 26, 2020) acknowledged that RCD was currently selling the Genesis brand "within the Hyundai dealership," but nevertheless again identified RCD's facility as "exclusive," and left blank a section addressing requirements

---

Program, as well as whether the AIP and related guideline requirements would impact RCD's existing, combined sale and service operation of its Hyundai and Genesis brands.

[6] Although RCD purchased the property located next door to the Racine Hyundai and Genesis dealership on January 31, 2020, there is little evidence showing what plans, if any, RCD had for this property.

for "dual dealerships."  (Mar. 5 Chklst., dkt. #21-15, at 4-5 and 15; Mar. 26 Chklst., dkt. #21-16, at 4-5 and 15.)

Although HMA suspended the Accelerate Incentive Program in March 2020 due to the COVID-19 pandemic, RCD continued working with HMA to comply with that program's rules.  Indeed, on June 4, 2020, Warner emailed Bozich a four-page, "Pragmatic Variance Checklist - GDSI 2.0 Hyundai Facility Program," which listed various, non-compliant issues with RCD's facility.  Like the earlier checklists, however, it continued to identify RCD's facility as "exclusive"[7] and marked the box asking about dual brands as "N/A."  (June 4 Chklst., dkt. #31-19.)  Moreover, HMA Representative Warner further stated that *to become GDSI 2.0 compliant*, RCD had to address the items on the checklist by either making the changes or filing a variance exception request.  Warner's email contained *no* requirement regarding a separation of RCD's Genesis franchise, nor did the checklist, except for a statement that "[t]emporary Hyundai and Genesis signage posted along the frontage road is non-compliant and must be removed."  (*Id.*, at 2.)

In responding to the checklist, Bozich estimated that RCD could bring its facility into compliance for no more than $500,000, and even Warner agreed that RCD had already done the heavy lifting when it built the new facility in 2017.  During a conference call on June 10, 2020, representatives from RCD and HMA also discussed the 23, non-

---

[7] Warner testified that this meant that RCD's facility was being reviewed as an exclusive dealership, but the parties generally dispute the significance of the term.

compliant issues identified in the checklist and the procedure for requesting a variance.[8] RCD then submitted its variance requests in July 2020, which also required no separation of RCD's Hyundai and Genesis operations.

On September 4, 2020, HMA's Executive Director of Dealer Development & Strategy, Rob Grafton, emailed a 26-page packet to dealers announcing the relaunch of the incentive program with modified rules and an updated facilities usage policy. Specifically, HMA updated its "Guide 105 – Facility Usage" as of August 31, 2020, to eliminate the limited time exception for Genesis operations that existed through December 31, 2021, and replace it with "Adaptive Exclusivity with Genesis" guidance, which only allowed Hyundai and Genesis dealerships to "share certain non-customer touchpoint, fixed facility operations," such as service shop and parts storage, with no time limit. (*See* Guide 105, dkt. #21-17, at 25-27.) Additionally, the FAQs included with the September 2020 email explained that Adaptive Exclusivity with Genesis allowed dealers to share certain facility operations with the Genesis brand and still meet HMA's definition of an exclusive facility. However, like the initial program announcement email, the parties dispute whether anyone at RCD received this September 2020 announcement packet before Warner emailed it to Bozich on July 19, 2021.

---

[8] The parties dispute what, if anything, was discussed in the conference call about the exclusivity of the RCD facility and whether any action needed to be taken with respect to the location of RCD's Genesis dealership. For example, HMA disputes Bozich's averment that Warner specifically told him during the conference call that RCD's facility was already exclusive and moving the Genesis franchise was *not* necessary to receive full incentive payments.

On October 5, 2020, owner/manager Bozich emailed Warner to ask when RCD would begin receiving the AIP payments.  By this time, however, Warner knew that HMA had just updated its exclusivity policy and that RCD would now have to remove the front-end, customer facing operations for its Genesis dealership from its joint facility with Hyundai to receive any incentive payments.  Still, Warner responded to Bozich the very next day that RCD "should be good to go" once it had taken care of "all the issues that were identified."  (Warner Oct. 6, 2020 email, dkt. #31-22.)  On October 30, 2020, Warner also emailed Bozich to ask about what RCD intended to do with Genesis in light of the Hyundai incentive program, and Bozich responded "Send me info. Know nothing."  While Warner avers that he further discussed the issue with Bozich in a later telephone conversation, Bozich maintains that he never heard anything back from Warner in response to his request for more information.  The parties also dispute whether acting general manager Basich had a discussion with HMA's sales manager about what RCD intended to do with its Genesis dealership in light of Hyundai's exclusivity requirements.

On December 7, 2020, HMA's project manager, Nichole Loy, sent RCD an email with a document labeled "Dealer Corrections and Variance Rejections," which identified 16 items that RCD needed to address to comply with GDSI 2.0, mainly signage and furniture, and two, additional items that had contingent approval.  Like Warner had in his October 2020 email, Loy also represented that this document was the *full* list of items needing correction, while making *no* mention of RCD's ongoing operation of its Genesis dealership in a joint facility with its Hyundai dealership, apart from the removal of the temporary Hyundai and Genesis signage posted along the frontage road.  In February 2021,

13

RCD's architect Rick Bierman also received HMA's approval of his plans to upgrade the facility to GDSI 2.0 standards for a cost of $233,325, which he then finalized. Accordingly, remodeling construction began on the joint dealer facility in March 2021.

Around this time, GMA separately sent RCD several documents about enrolling in its "Genesis Keystone Program," which would require RCD to construct an entirely new facility for its Genesis dealership -- an expense of $5-10 million -- in return for a separate set of incentive payments from GMA. Understandably enough, Bozich decided not to enroll in the program because RCD's current, joint facility was only three years old.

### D. Sale of RCD Dealerships

Nevertheless, by the end of 2020, RCD was in discussions with Zeigler Auto Group about selling its Hyundai and Genesis dealerships as part of a package deal along with Zeigler's purchase of other dealerships in the Racine area owned by Home Run Auto Group. On April 30, 2021, an Asset Purchase Agreement ("APA") and Real Estate Sales and Purchase Agreement ("RESPA") were executed, in which Zeigler purchased four dealerships, including RCD, for $50 million and their associated real estate for an additional $61 million. RCD and Zeigler further agreed that: (1) RCD's Hyundai and Genesis franchises would continue to operate in the same facility; and (2) Zeigler would receive all of the Accelerate Incentive Program payments related to construction, compliance with GDSI 2.0 standards, and facility exclusivity. Immediately after the APA was signed, RCD's attorney sent Warner a copy of the APA and a letter requesting that Hyundai approve the sale and submit any request for seller information to Bozich and requests for buyer information to Zeigler.

14

On May 14, 2021, HMA requested that Zeigler complete certain application documents in its online portal and provide sales performance and customer satisfaction information.  GMA made similar requests for information on May 17, 2021.  Ziegler submitted the requested information on HMA's online portal on May 28, 2021; it made similar submissions to GMA soon after.  During a conversation around this time, Zeigler also told Warner that the asset purchase agreement assumed that RCD's Hyundai and Genesis dealerships would continue to do business in the same, joint facility and that Zeigler would receive all of the AIP payments otherwise due RCD if it had continued its dealerships.  However, Warner explained that upon purchasing these two dealer franchises, Zeigler would only qualify for the AIP payments if (1) Ziegler built a new facility for the Genesis franchise *or* (2) RCD voluntarily terminated the Genesis franchise.  Warner further advised Ziegler that GMA was launching its own Genesis incentive program -- "the Keystone Program."

Although Warner emailed a coworker about RCD's apparent "mischaracterization" of the incentive program as it related to its own Genesis franchise, he neither told Bozich about this conversation with Zeigler nor that the asset purchase agreement could not move forward as the parties had contemplated – *i.e.*, with Ziegler having to build a separate Genesis facility or forego AIP or Keystone incentive payments.  Rather, Warner testified that he did not think that this information was germane to the closing of RCD's sale of its Hyundai and Genesis dealer franchises.

In the meantime, RCD's owner Bozich and Zeigler had their own, additional communications about RCD's entitlement to receive Accelerate Incentive Program

15

payments, during which Bozich continued to state that the Hyundai and Genesis dealerships did not need to be separated. Although it is not clear why, Ziegler did not immediately tell Bozich anything about what he had learned from Warner about the GMA dealership needing a separate facility following its sale or lose incentive payments.

On July 1, 2021, HMA informed Zeigler that certain documents were missing from his initial submission to HMA, but "in the interim," the current package would proceed through "two stages of review." (Dkt. #21-32.) On July 19, Warner and Zeigler also had further discussions about the location of the Genesis dealership specifically, during which Warner confirmed that: (1) both the Hyundai and Genesis operations in Racine are recognized as currently being located in the Hyundai facility; (2) Genesis is not (and presumably would not) be recognized as being operated on neighboring property owned by RCD; and (3) the only way for RCD or Ziegler to qualify for the Accelerate Incentive Program was to have its own Hyundai facility separate from the Genesis dealership. That same day, Zeigler's Chief Financial Officer, Dan Scheid, emailed Bozich to advise that: (1) there was a problem with the contemplated purchase because the information Bozich had provided on the viability of the Hyundai and Genesis dealerships continuing to operate in their joint facility was not accurate; and (2) that the Genesis dealer operations had to be moved out of the Hyundai facility for Ziegler to qualify for the contemplated AIP.

Bozich emailed Warner on July 19, 2021, expressing his concerns about what he considered to be a dramatic change in the exclusivity requirement for continuing eligibility for payment under Accelerate Incentive Program. In response, Warner stated that the rules had always been clear and RCD's Genesis franchise had to be removed from its Hyundai

16

facility to receive any AIP payments.  Although HMA disputes it, Bozich avers that Warner further told him that the sale would only be approved if RCD terminated its Genesis dealership.  Shortly after this conversation, Warner represents he sent Bozich the August 31, 2020, relaunch packet that had been emailed on September 4, 2020, although as previously discussed, there is a dispute as to whether anyone affiliated with RCD had received it before, including Bozich.[9]

### E. RCD Decides to Terminate Genesis Dealership

On July 20, 2021, Bozich next emailed Ziegler to ask, "Genesis – do you want me to terminate? Or you keep?," to which Zeigler responded that RCD should terminate. (Dkt. #21-38.)  Therefore, RCD sent HMA a letter the same day, stating that it was voluntarily terminating its Genesis franchise.  That same day, RCD and Zeigler also executed the "First Amendment to the Asset Purchase Agreement" ("Amended APA"), reflecting the termination of the Genesis dealership and a purchase price reduction of $2 million.  In particular, Ziegler had originally agreed to purchase Home Run Auto Group's Hyundai, Toyota, Honda, and Subaru dealerships for $50 million, but that amount was negotiated down to $48 million following the decision to terminate the Genesis franchise.

The following day, July 21, 2021, GMA sent RCD a follow-up letter acknowledging its voluntary termination of the Genesis dealership, along with an unsigned mutual release

---

[9] More specifically, owner/manager Bozich avers that up until July 19, 2021:  he did not know that the program had ever been suspended and relaunched; he had never seen Guide 105 on facility usage; and he did not know that all of RCD's program payments would now be tied to the removal of its Genesis franchise operation from the Hyundai operation.

agreement.  Around this time, Warner further emailed a member of HMA's national dealer development office that "[t]his is a big win for us as we were able to secure a Genesis voluntary termination," which is consistent with Warner's later testimony that Racine was not considered a market area in which a Genesis dealership fit into and eliminating that dealership was in everyone's best interest.  (Dkt. #32-2, at 144-45.)

Just one day later, July 22, 2021, HMA had also conditionally approved the proposed transfer of the Hyundai dealer franchise to Ziegler provided that RCD:  (1) voluntarily terminate its own Hyundai dealer agreement; (2) execute a mutual release agreement; and (3) pay its outstanding parts account balance.  Bozich signed the mutual release agreement with GMA on July 23, 2021, and with HMA by July 26, 2021.[10]  RCD and Ziegler closed on the sale on July 26, 2021.

OPINION

I. **Motion For Leave to Amend**

A few weeks after defendants HMA and GMA filed their motions for summary judgment, plaintiff RCD moved for leave to file an amended complaint seeking to narrow its claims in some respects and broaden them in others without alleging any new facts.  (Compare dkt. #1 with dkt. #47.)  The proposed amended complaint is narrower because it removes claim no. 5 under the WMVDL, Wis. Stat. § 218.0116(1)(z), for retaliation, and claim no. 8 under the WFDL, Wis. Stat. § 135.03, for a wrongful termination claim.  While defendants do not object to the dismissal of those claims, plaintiff's proposed

---

[10] Although the release is dated July 26, 2021, Bozich says that he signed it on July 24 and someone from HMA typed in the July 26 date.

amended complaint would also add alternate tort actions against HMA for misrepresentation, promissory estoppel, and unconscionable practices in violation of a different provision of the WMVDL, Wis. Stat. § 218.0116(1)(f).  Defendants object to these new claims on the grounds of undue delay, unfair prejudice, and futility, which if valid, would all be good grounds for denying a request for leave to amend.  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Johnson v. Cypress Hill*, 641 F.3d 867, 872 (7th Cir. 2011).  In response, plaintiff argues that fairness requires it be allowed to pursue alternate tort remedies should HMA prevail on its alternative argument that the Accelerate Incentive Program agreement is an "illusory contract" over which HMA retains absolute discretion. However, for reasons explained below, because the court concludes that the AIP was indeed an enforceable contract between HMA and RCD, it would be unfair and wholly unnecessary for RCD to be allowed to pursue alternative remedies in tort at this stage of the lawsuit.  Accordingly, while the court will grant RCD's effective request to voluntarily dismiss certain of its WFDL and WMVDL claims with prejudice, it will deny its motion to amend to add new claims due to undue delay, unfair prejudice and futility.

## II. Motions for Summary Judgment

This leaves defendants motions for summary judgment.  As a threshold matter, defendants argue that all of RCD's claims are barred by the mutual releases that RCD executed with HMA and GMA in conjunction with the sale of its dealership assets to Ziegler in July of 2021.  Alternatively, defendants argue that even if RCD did not release some or all of its claims, there is no factual basis to hold either GMA or HMA liable under any legal theory.  The court addresses these arguments below.

19

## A.  Mutual Releases

Plaintiff RCD does not dispute that it released all past and future claims against defendants HMA and GMA "relating in any way to the Dealer Agreement or the relationship created thereunder or the termination thereof, the operation of the business of Dealer, or any acts or omissions relating in any way to the sale" of Hyundai and Genesis products, *except* for claims relating to four distinct issues.  (GMA mut. rel., dkt. #21-44, at ¶ 1; HMA mut. rel., dkt. #21-45, at ¶ 1.)  Moreover, despite plaintiff's arguments to the contrary, *all* of its remaining claims relate to the parties' dealership relationship and the operation of Racine Hyundai.  Indeed, plaintiff principally claims that defendants coerced it into providing an exclusive facility for Hyundai vehicles by threatening to withhold AIP payments unless RCD terminated its GMA dealership or built a separate facility for its Genesis franchise, even though in its view the terms of HMA's AIP did *not* require *RCD* to separate operations of the two dealerships as a going concern.

Finally, plaintiff argues that the releases are unenforceable against some or all of its remaining claims for three reasons:  (1) the releases exempt claims related to incentive payments; (2) the releases violate the WMVDL; and (3) the releases were obtained by coercion or duress.[11]  Because the court agrees with RCD's first and second arguments, it

---

[11] Plaintiff also takes issue with the fact that defendants did not plead the releases as an affirmative defense, but this argument is a non-starter because HMA's first amended answer -- the operative responsive pleading -- includes this affirmative defense.  (*See* amd. ans., Dkt. #18, at 14.)

is unnecessary to consider whether the releases otherwise violate Wisconsin law or were obtained by coercion.[12]

### 1. Exemption for Incentive Payments

Both mutual release agreements expressly state that they do not cover any claims relating to "post-termination repurchase credits and obligations between the parties arising out of Incentive Payments, Earnback or rebate programs." (Dkt. ##21-44 and 21-45, at ¶ 2.) Defendants argue that this exception does not apply to RCD's remaining claims because HMA never issued incentive payments to RCD and does not have any obligations to RCD related to incentive payments. However, that reads the term "obligations" very narrowly, especially given the ongoing dispute between the parties over whether the transference of the joint facility for Hyundai and Genesis should affect future AIP payments. Indeed, in this sense, *all* of RCD's remaining claims relate to: the particular obligations of the incentive program in which RCD enrolled; HMA's administration of the program with respect to RCD; HMA's decision that RCD's facility would not qualify for incentive payments if Ziegler continued to operate both the Hyundai and Genesis franchises out of the same location; and the conditions that HMA placed on its approval of the Asset Purchase Agreement between RCD and Ziegler based on its interpretation of the AIP rules. Accordingly, the court agrees that the mutual releases expressly exempt RCD's claims in this case, meaning this affirmative defense fails as a matter of law.

---

[12] In any event, the parties' arguments related to coercion and duress dovetail with their arguments concerning the merits of several of RCD's WMVDL claims, which are discussed at length below.

However, even if there is arguable room for ambiguity in this exception, the releases are void under the WMVDL for the reasons discussed below.

### 2. WMVDL Protections Against Mutual Releases

The WMVDL contains various provisions intended to protect motor vehicle dealers from unfair treatment by auto manufacturers, *Forest Home Dodge, Inc. v. Karns*, 29 Wis. 2d 78, 85, 138 N.W.2d 214 (1965), including a prohibition against any agreement that "waive[s] a remedy or defense available to a distributor or dealer or other provision protecting the interests of a distributor or dealer," Wis. Stat. § 218.0114(9)(a). An "agreement" is defined as "a contract that describes the franchise relationship between manufacturers, distributors, importers and dealers," Wis. Stat. § 218.0101(1); and a "franchise" is defined as "the right to buy, sell, distribute or service a line make of motor vehicles that is granted to a motor vehicle dealer or distributor by a manufacturer, importer or distributor," Wis. Stat. § 218.0101(13).

RCD contends that HMA's July 22, 2021 letter, conditionally approving RCD's proposed sale to Ziegler, as well as the mutual releases themselves, qualify as agreements under the statutory definition. In contrast, HMA argues that this letter is not a contract that includes an offer, acceptance, and consideration because it simply states that HMA will approve the sale if certain tasks are completed. *See Kamikawa v. Keskinen*, 44 Wis.2d 705, 710, 172 N.W.2d 24, 26 (Wis. 1969) (an enforceable contract has three elements: an offer, an acceptance, and consideration). However, that argument is wholly unpersuasive. HMA expressly offered to approve the sale (offer and consideration) if RCD would perform certain tasks, including executing documents and making payments

22

(acceptance and consideration).  *See Carroll v. Stryker Corp.*, 670 F. Supp. 2d 891, 898 (W.D. Wis. 2009), *aff'd*, 658 F.3d 675 (7th Cir. 2011) ("An offer is a communication by a party of what it will give or do in return for some act by another.") (citing *In re Lube's Estate*, 225 Wis. 365, 368, 274 N.W. 276, 278 (Wis. 1937)).  Moreover, RCD formally accepted HMA's offer of conditional approval by meeting the stated conditions in the letter.  *Id.* ("Like an offer, an acceptance can be communicated in writing, orally or implied from the parties' conduct.") (citing *Morris F. Fox & Co. v. Lisman*, 208 Wis. 1, 240 N.W. 809, 811 (Wis. 1932)).  Finally, RCD and HMA clearly intended to be bound by the letter's stated terms.  *Id.* (consideration is evidence of the parties' intent to be bound to the contract and consists of a benefit to the promisor or a detriment to the promisee) (internal citations omitted).

In any event, even if the letter of conditional approval cannot be considered a contract, defendants do not dispute that the mutual releases executed by all parties are themselves binding contracts.  Instead, they argue that the releases are not *prohibited* by § 218.0114(9)(a) because they do not address RCD's right to buy, sell, distribute, or service vehicles.  However, the releases clearly describe the parties' franchise relationship by expressly referencing RCD's dealership agreements with HMA and GMA, and further stating that RCD "desires to voluntarily terminate the Dealer Agreement" and "sever that relationship in its entirety."  (Dkt. #21-44, at 2; Dkt. #21-45, at 2.)  Defendants argue in the alternative that the mutual releases are permitted under a different provision of the WMVDL, Wis. Stat. § 218.0114(10)(a), which makes subsection (9) inapplicable to "[a]

settlement agreement that is entered into by a dealer or distributor voluntarily with respect to a particular dispute existing when the settlement agreement is reached."

In particular, defendants argue that the mutual releases were effectively a settlement because all of the conduct on which RCD bases its claims occurred *before* it signed the GMA release on July 23, and the HMA release on July 26, since Ziegler had already demanded a lower purchase price on July 19, and RCD's termination of the Genesis dealership had occurred on July 20, 2021. In support of their argument, defendants refer to cases in which courts have upheld releases that were executed in connection with the termination of an automobile franchise, so long as (1) the dealer was not *required* to execute the release and (2) the court found sufficient consideration. *E.g.*, *Edwards v. Kia Motors of America, Inc.*, 554 F.3d 943, 947 (11th Cir. 2009); *Sportique Motors, Ltd. v. Jaguar Cars, Inc.*, 195 F. Supp. 2d 390, 396 (E.D.N.Y. 2002), *aff'd*, 55 F. App'x 580 (2d Cir. 2003); *Grand Motors, Inc. v. Ford Motor Co.*, 564 F. Supp. 34, 43 (W.D. Mo. 1982); *Three River Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 895 (3d Cir. 1975).

As an initial matter, the court notes that because these cases involve decisions from courts outside this circuit applying different state laws, they are not particularly helpful in interpreting the unique language in Wis. Stat. §§ 218.0114(9) and (10)(a). Moreover, even though there is general, non-binding authority for enforcing retrospective, mutual release agreements to settle existing claims between automobile manufacturers and dealers, the releases executed in this case cannot reasonably be construed as "a voluntary settlement" of a particular dispute existing at the time RCD signed the agreements. Indeed, neither the letter of conditional approval asking for the releases or the mutual releases

24

themselves identify a dispute.  Instead, the documents discuss the end of the parties' franchise relationship and the sale to Ziegler, which are governed by separate WMVDL provisions.  Finally, as discussed further below, RCD alleges that Bozich did not believe he had any choice but to sign the releases to protect the overall sale of RCD's many dealerships to Ziegler, which if true, again raises a question about whether any settlement could be found voluntary or a binding waiver of statutory rights.  Accordingly, the court concludes that the mutual releases are both prohibited agreements under § 218.0114(9)(a) *and* not subject to the exemption as settlement agreements under § 218.0114(10)(a).

### B.  GMA's Liability

As to the merits, RCD has asserted five of its eleven claims against GMA:  claim nos. 1-3 for WMVDL violations; claim no. 7 for an ADDCA violation; and claim no. 9 for tortious interference with asset purchase agreement.  However, GMA argues RCD has failed to offer *any* evidence that GMA engaged in the conduct on which RCD bases its claims, with the exception of claim no. 2 regarding timing and procedural requirements under Wis. Stat. § 218.0116(1)(Lm).  For example, GMA points out that it was HMA, *not* GMA, that:  (1) promulgated rules for and administered the Accelerate Incentive Program; (2) conditioned approval of the sale of dealer assets to Ziegler upon termination of the Genesis dealership; and (3) discussed the incentive program with Ziegler.  In response, RCD merely offers the following conclusory statement:

> Although the Accelerate Program is a "Hyundai" program, it must be viewed in the larger context of the relationship between HMA and GMA.  GMA is a subsidiary of HMA.  In this case, RCD worked through Guy Warner as the single point of contact for both HMA and GMA.  From the dealer-principal

> perspective, the management of HMA and GMA was the same. There [were] not two separate and distinct teams from the dealer perspective.  HMA and GMA worked together.

(RCD's opp. br., dkt. #38, at 1.)

What is wholly missing from this statement is any evidence that Warner acted on behalf of GMA with respect to HMA's Accelerate Incentive Program; nor does RCD set forth any legal authority for piercing the corporate veil between these two entities.  *Bradley v. Vill. of Univ. Park, Illinois*, 59 F.4th 887, 897 (7th Cir. 2023) (arguments waived if underdeveloped, conclusory, or unsupported by law or if not raised at all).  Indeed, in its proposed findings of fact, RCD identifies Warner as *HMA's* senior regional manager and marketing representative, whose job it was to "understand HMA goals and policies, assist and communicate with the HMA/GMA dealer principals, and facilitate the implementation of incentive programs."  (Dkt. #33, at ¶¶ 50, 55-56.)  Although the parties do not dispute that Bozich's primary communication with HMA was through regular emails and phone calls with Warner, RCD does not adduce evidence that the same was true with respect to GMA.  Finally, while RCD points out that Warner sent the GMA dealer agreement to RCD on February 1, 2019, this one act is insufficient to show that Warner acted on behalf of GMA in implementing and administering the AIP solely offered by HMA, much less to pierce the corporate veil between the two American distributorships.

Additionally, the simple fact that GMA is a subsidiary of HMA is not enough to impute liability to GMA for HMA's conduct.  Again, "[c]ourts begin with the presumption of corporate separateness."  *Taurus IP v. DaimlerChrysler Corp.*, 519 F. Supp. 2d 905, 919 (W.D. Wis. 2007), *aff'd*, 726 F.3d 1306 (Fed. Cir. 2013).  Although the alter ego and

26

related doctrines may be used to pierce the corporate veil or disregard corporate fiction to reach a controlled entity like a subsidiary, *id.*, RCD has neither made this argument nor offered sufficient evidence for this court to allow piercing. *See Prince v. Appleton Auto, LLC*, 978 F.3d 530, 537 (7th Cir. 2020) (plaintiff's unsupported allegations insufficient to pierce corporate veil). Accordingly, GMA is entitled to summary judgment with respect to all of RCD's claims against it based on HMA's conduct, which includes claim numbers 1, 3, 7, and 9.

This leaves RCD's claim that GMA violated the requirement in Wis. Stat. § 218.0116(1)(Lm) that a manufacturer or distributor comply with certain timing and procedural terms regarding a dealer's request for approval of a change in ownership. However, RCD's brief in opposition to defendants' motions for summary judgment again only addresses the timing of *HMA's* consideration and approval of the proposed sale to Ziegler; worse, RCD fails to respond to GMA's arguments that it complied with any timing requirements. (*See* Dkt. #38, at 37-40.) Because RCD also has waived its argument with respect to this claim, *see Bradley*, 59 F.4th at 897 (failing to respond to new argument raised by opposing party results in waiver), the court will grant GMA's motion for summary judgment and dismiss it as a defendant in this lawsuit.

## C.   HMA's Liability

All of RCD's claims raise different challenges to HMA's conduct under the WMVDL, ADDCA, and the Wisconsin common law related to its administration of the Accelerate Incentive Program, particularly with respect to RCD's Hyundai dealership and interpreting the program's requirements in considering whether to approve the Asset

Purchase Agreement between RCD and Ziegler. The court will address each of these claims separately.

### 1. WMVDL Claims

As discussed above, the WMVDL contains various provisions intended to protect motor vehicle dealers from unfair treatment by manufacturers. *Forest Home Dodge,* 29 Wis. 2d at 85, 138 N.W.2d at 214. The statute is enforced administratively by the Wisconsin Department of Transportation ("DOT"), but it also allows dealers like RCD to bring a civil action for damages, costs, and reasonable attorney fees to recover for pecuniary loss caused by a distributor's violation of certain provisions of the law, including conduct prohibited by the six subsections of § 218.0116 on which RCD relies in this case. *See* Wis. Stat. § 218.0163(1). If the violation is willful, the dealer is entitled to treble damages. *Id.* As discussed below, the court concludes that there are genuine issues of material fact precluding summary judgment on all but one of RCD's claims under these provisions.

### a. Claim No. 1

Section 218.0116(1)(wm) prohibits distributors from "unreasonably requir[ing] or coerc[ing] or attempt[ing] to coerce a dealer to provide or maintain exclusive facilities for a particular line make of motor vehicles" and places the burden of proof to demonstrate reasonableness on the distributor. Wis. Stat. § 218.0116(1)(wm). The statute doesn't define the word "coerce," but this court has applied the ordinary meaning of "to compel by threat or force, either physically or through economic means" in a similar dealership case. *See Dahl Automotive Onalaska Inc. v. Ford Motor Co.,* 588 F. Supp. 3d 929, 943 (W.D.

28

Wis. 2022) (citing Merriam-Webster, https://www.merriam-webster.com/dictionary/coerce; *Coercion*, Black's Law Dictionary (11th ed. 2019)).

RCD asserts that HMA did just that: used the Accelerate Incentive Program as an economic lever to coerce the cancellation of its Genesis dealership as a condition of sale. In support of this contention, RCD argues that: (1) the Accelerate Incentive Program's exclusivity requirement is fundamentally unfair to small dealerships like RCD that accepted HMA's offer of a separate Genesis franchise in 2018 while operating in a joint facility; and (2) HMA's specific actions related to RCD's participation in the program were intentionally misleading and deceptive, so as to be unconscionable and egregious. As discussed below, although the court agrees that RCD has not presented sufficient evidence for a reasonable jury to find in its favor as to this first claim, plaintiff has offered sufficient evidence to find genuine issues of material fact exist as to the second claim, precluding summary judgment.

### (i) Exclusivity Requirement

HMA cites this court's recent decision in *Dahl*, 588 F. Supp. 3d 929, in support of its general contention that courts routinely uphold automotive dealership incentive programs requiring exclusive dealership facilities. In *Dahl*, Judge Peterson held that Ford's provision of incentive payments to dealers who chose to construct an exclusive showroom was not coercive just because larger dealers can recoup their costs faster than smaller dealers; instead, the court reasoned that "[a]ny coercive effect of the exclusivity standard must come from the adverse consequences of opting out of the standard." *Id.* at 943. Accordingly, the court concluded that the plaintiffs in *Dahl* had no basis for alleging that

the exclusivity standard was coercive, having failed to adduce any evidence that the incentive payments actually gave participating dealers a competitive advantage, particularly in light of the fact that participating dealers incurred significant costs in constructing an exclusive showroom. *Id.; see also Cabriolet Porsche Audi, Inc. v. Am. Honda Motor Co..*, 773 F.2d 1193, 1210 (11th Cir. 1985) (there is "nothing coercive in presenting to a car dealer an opportunity to reap substantial profits from an exclusive dealership in exchange for the expenditures necessary to establish the exclusive dealership"); *Brentlinger Enterprises v. Volve Cars of North America, LLC*, No. 2:14-CV-360, 2016 WL 4480343, at *2 and *10 (S.D. Ohio Aug. 25, 2016) (Volvo program awarding exclusive dealerships $250 more per vehicle sale than non-exclusive dealerships was lawful and not "coercion" under the Ohio Motor Vehicle Franchise Act); *Mercedes-Benz USA LLC v. Concours Motors, Inc.*, No. 07-C-0389, 2010 WL 55473, at *10-11 (E.D. Wis. Jan. 4, 2010) (manufacturer incentive for constructing standalone Mercedes-Benz facilities not coercive).

In this case, however, RCD argues that the Accelerate Incentive Program is fundamentally different from the incentive program in *Dahl* because it has a coercive effect on Hyundai dealers who chose to operate a Genesis franchise in lieu of accepting a goodwill payment in 2018. Specifically, RCD points out that the dealers who declined a Genesis franchise and accepted the goodwill payment already have exclusive facilities for which they will receive *all* three payments under the AIP after spending only about $300,000 to upgrade their facility to GDSI 2.0; while in contrast, dealers like RCD who signed on to a Genesis franchise either had to build an entirely new facility or terminate their Genesis franchise to receive *any* AIP payments. Further, according to RCD, HMA *knew* that this

30

second category of dealers would be forced to terminate their Genesis franchises to avoid significant construction expenses if they wanted to participate in the program.

Although HMA argues that RCD's claim is largely based on a speculative hypothetical without any evidence to support it, the evidence of record does show that HMA's Accelerate Incentive Program provided dealers holding both Hyundai and Genesis franchises with the following options:  (1) keep the Genesis dealership and continue to earn revenue from Genesis sales, but forgo any AIP payments; (2) terminate the Genesis dealership and lose future revenue from Genesis sales but receive AIP payments; *or* (3) keep the Genesis dealership, build an entirely new facility for its Genesis operations, continue earning revenue from Genesis sales, and receive AIP payments.  Even so, RCD merely *asserts* that only options one and two were feasible, because spending up to $10 million on a new facility was not economically feasible, particularly by the July 26, 2021 closing date.  As HMA points out, however, RCD has not presented any *evidence* to support this assertion, including what amount of revenue dealers like RCD stood to lose by terminating their Genesis dealerships.  More specifically, as HMA also points out, the economic advantages and disadvantages of owning separate or combined Hyundai and Genesis dealerships are highly individualized, so a claim that the incentive program is not "fair or equitable" would have required evidence of the specific, material effect on RCD and other small dealers in relation to its larger competitors.  *Dahl,* 588 F. Supp. 3d at 945.

Instead, RCD has presented no evidence to establish that the Accelerate Incentive Program itself created a competitive disadvantage for RCD, much less for small dealers in general.  On the contrary, the only evidence is that when RCD decided to get out of the

Hyundai/Genesis dealerships business altogether, keeping the Genesis brand was only worth $2 million to the new owner.

If anything, the evidence is that GMA's Keystone incentives would not make a standalone Genesis facility a viable economic proposition in Racine, but this does not make it actionable, especially against HMA.[13] *See Cabriolet,* 773 F.2d at 1210 ("We have little doubt that had Honda threatened to deny Cabriolet all cars, or any cars to which it was entitled, unless Cabriolet provided an exclusive facility, this would be evidence of coercion.") (citations omitted); *Enterprises,* 2016 WL 4480343, at *10 ("The Court recognizes that line between [an] 'incentive' and 'coercion' is thin as an incentive, by definition, is designed to induce a person to do that which the person offering the incentive wishes done."); *but see Mercedes-Benz,* 2010 WL 55473, at *10-11 (manufacturer incentive for constructing standalone facilities not coercive where there was no evidence that Mercedes-Benz threatened to terminate dealership if Concours refused to build new facilities).

Relatedly, assuming RCD *was* grandfathered in as "exclusive" despite running its Hyundai and Genesis dealerships out of the same facility (as the court must assume for purposes of summary judgment), RCD has cited *no* decision requiring a manufacturer/distributor like HMA to extend that commitment to a purchaser of a

---

[13] At summary judgment, it is unclear whether RCD received the AIP payments going forward or the $2 million reduction was for the anticipated denial even if its improved facility was used exclusively for Hyundai's sales and service going forward. The record is also silent as to whether Ziegler has proceeded to build a separate building to acquire its own Genesis franchise, but it appears unlikely given (1) HMA's apparent view that the Racine market would not support such a standalone dealership; and (2) RCD's essential concession that the cost of building such a separate facility was not economically viable.

combined facility upon a proposed transfer, *at least absent* language in the parties' written agreement to that effect.  Here, HMA offers evidence that no such agreement occurred, relying principally on the language in the official dealer notice rolling out the AIP and in the GDSI 2.0 standards in January 2020, both of which Bozich denies he or anyone else at RCD received.  More importantly, even if the jury rejects Bozich's testimony that RCD never received proper notice based on subsequent notice in a March 5, 2020, email referencing a similar Guide 105-Facilities usage and other evidence of notice to RCD, HMA ignores all of the other conflicting, contemporaneous communications with RCD.  To begin, Bozich's signature enrolling RCD in the "Hyundai Accelerate Program" appears to suggest that RCD *will* satisfy the "exclusivity" requirement in GDSI 2.0 by fulfilling certain improvements in its existing, joint facility.  Moreover, not only is there no requirement in those improvements that RCD move out its Genesis operations from that facility, but this same commitment arguably appears to support RCD's claim that AIP payments *were meant to* transfer to a new dealer, like Ziegler, as part of a buy/sell agreement, as long as the dealer agrees to follow through with those same improvements:

> Dealer agrees that in the event that Dealer enters into a Buy/Sell Agreement to sell its Hyundai Dealership within ten (10) years from the date of Certified Compliance with Exclusive GSDI 2.0, the purchaser identified in such Buy/Sell Agreement will agree as a condition precedent to closing on the Buy/Sell Agreement in writing, and in a form acceptable to HMA, to honor all obligations in this Agreement as applicable. If purchaser will not agree to, in writing, honor this Agreement, then Dealer must repay to HMA all Support Payments that Dealer has received from HMA pursuant to this Agreement, as a condition precedent to HMA consenting to the Buy/Sell transaction.

(Dkt. #21-14, p. 6, ¶ 12.)

Of course, HMA disputes that the AIP and related discussions bound it in any way to honor any understanding between RCD and HMA representatives, beyond the formal, written documents.  And within a few weeks of the notice that RCD's proposed asset sale to Ziegler contemplated continuation of the AIP payments to Ziegler despite Hyundai and Genesis dealerships operating in the same facility, there appears to be *no* dispute that Warner at least told Ziegler those payments would terminate unless:  (1) Ziegler built a new facility for Genesis; or (2) RCD "voluntarily" terminate its right to sell Genesis franchise.  Regardless, as explained below, RCD does not rely solely on the existence of the exclusivity requirement to support its claim of coercion.  Instead, RCD has come forward with sufficient evidence to create a material, factual dispute over:  the nature of the parties' actual agreement as to the meaning of what would constitute an exclusive Hyundai operation; whether HMA timely refused to extend its approval to the proposed terms of the Asset Purchase Agreement; *and* whether RCD actually terminated its Genesis franchise voluntarily or was coerced to do so.

### (ii) HMA's Arguable Coercion

Although HMA offered RCD options to qualify for the incentive program and did not expressly demand the termination of RCD's Genesis dealership, a reasonable jury could find when viewing the disputed facts in a light most favorable to RCD that HMA coerced or attempted to coerce RCD to terminate the Genesis franchise through the following bait and switch conduct:

- RCD was not provided any information about the AIP or the new Guide 105 policy before or at the time Bozich signed the enrollment form, which stated that it was the entire agreement concerning the "subject herein" and superseded all prior statements, correspondence, and agreements on the subject.

- Warner did not provide RCD with any information about the AIP's exclusivity requirements or their applicability to RCD's combined facility until July 19, 2021, a few days before RCD was scheduled to close on the dealership sale to Ziegler, even though his prior communications with Bozich and Ziegler made it clear that Bozich had not received the program materials and misunderstood the exclusivity requirement and program rules.

- Warner led Bozich to believe that RCD was on track to receive the first two incentive payments related to GDSI 2.0 compliance.

- The compliance checklists, variance request forms, and other similar documents identified RCD's facility as exclusive despite having a dual dealership and required no further action from RCD as to its Genesis franchise to be eligible for AIP payments.

- HMA representatives specifically told Bozich during a June 2020 conference call that RCD's facility was already exclusive and moving the Genesis franchise was not necessary to receive full incentive payments.

- When Bozich asked Warner in October 2020 whether RCD would receive its AIP payments, he also responded that RCD should be good to go once it addressed the issues in HMA's most recent compliance checklist, which did not talk about moving the Genesis franchise.

- Warner failed to respond to Bozich's October 2020 request for more information about the state of RCD's Genesis franchise.

- Warner knew Ziegler would be giving up about $2,000,000 in incentive payments by keeping the Genesis franchise and encouraged Ziegler to participate in the Keystone Program, which required Ziegler to build a new Genesis facility.

- In a phone call on July 21, 2021, Warner told Bozich that HMA would approve the Asset Purchase Agreement if RCD terminated its Genesis franchise.

Of course, HMA disputes that many of above things occurred, or disagrees about their meaning and significance, but taking the evidence as a whole and in the light most favorable to RCD, a reasonable jury could conclude that HMA had coerced RCD to build

35

and then improve upon its new joint facility for sales of its cars, then unreasonably required RCD to terminate its Genesis franchise -- a result that Warner later described as a "big win" for HMA, arguably because it did not consider Racine to be a viable market for Genesis.  Accordingly, both HMA's and RCD's motions for summary judgment will be denied as to the § 218.0116(1)(wm) claim.

> **b.  Claim No. 3**

Section 218.0116(1)(i)(2) prohibits a distributor from "unfairly, without due regard to the equities or without just provocation, directly or indirectly cancel[ing] or fail[ing] to renew the franchise of any motor vehicle dealer."  That statute further provides that "due regard to the equities" means "treatment in enforcing an agreement that is fair and equitable to a motor vehicle dealer or distributor and that is not discriminatory compared to similarly situated dealers or distributors."  *Id*., at (1)(i)(1).  RCD relies on the same basic conduct outlined above as to Claim No. 1 in support of its § 218.0116(1)(wm) claim.[14]  In response, HMA argues that it cannot be held liable for indirectly cancelling a dealership if the termination is prompted by the dealer's own self-interest.  *See Fred Menke's Car Store, Inc. v. Volvo N. Am. Corp*., 698 F. Supp. 1287, 1295 (D. Md. 1987), *aff'd*, 862 F.2d 869 (4th Cir. 1988) (Volvo's refusal to approve proposed dealership relocation not unreasonable after Menke breached dealer agreement by relocating dealership in the face

---

[14] HMA contends that this theory is a midstream change by RCD, which alleged that HMA violated this provision by conditioning its approval of the sale to Ziegler on RCD's termination of its Genesis dealership.  However, RCD's complaint actually alleges that HMA violated this provision "[f]or the reasons previously alleged, *and* by conditioning its approval of the sale" on the Genesis dealership termination.  (Dkt. #1, at ¶ 91 (emphasis added).)  Therefore, RCD's current theory of liability is not inconsistent with the complaint, which includes all of the factual allegations that RCD has cited in its summary judgment submissions.

of Volvo's express, repeated disapprovals).  However, given the genuine issues of material

fact with respect to the alleged conduct here, the court cannot decide as a matter of law

that termination of RCD's dealership was voluntary or coerced.  Accordingly, neither party

is entitled to summary judgment as to Claim No. 3 as well.

### c.   Claim No. 2

Section 218.0116(1)(Lm) of the WMVDL requires a distributor to comply with

certain timing and procedural requirements set forth in § 218.0134(2)(a) and (b) regarding

a dealer's request for approval of a change of ownership.  RCD claims that HMA failed to

serve it with:  a written list of information reasonably necessary to approve or deny the sale

to Ziegler within 20 days of receiving notice of the sale, in violation of subsection

.0134(2)(a); and written disapproval of the proposed sale within 30 days of the later of

receipt of notice of the sale or receipt of all the information specified in the written list

served pursuant to subsection (a), in violation of subsection .0134(2)(b).  Since there is no

dispute that RCD provided HMA with notice of the Asset Purchase Agreement on April

30, 2021, to which HMA responded on May 14, less than 20 days later, by email to RCD

and Ziegler, outlining the documentation it needed to evaluate the proposed sale, along

with a package of documents to be completed and uploaded to HMA's online portal, RCD

has failed to provide sufficient evidence to support its claim that HMA failed to meet the

20-day requirement in subsection .0134(2)(a), and plaintiff will not be allowed to proceed

further with that claim.

Instead, RCD's response to HMA's motion focuses on subsection .0134(2)(b),

pointing out that even though Ziegler submitted all of the requested documents via the

online portal on May 28, 2021, HMA did not issue a written statement of disapproval within 30 days, which would have been June 27, 2021.  In response, HMA asserts that the 30-day clock did not expire on June 27, because contrary to RCD's representation, HMA it had *not yet received* all of the information identified in its May 14 request, as evidenced by an email sent to Ziegler on July 1, 2021, stating that certain documents were missing from Ziegler's initial submission to HMA.  RCD disagrees, contending that this missing information was not reasonably necessary for HMA to determine whether the proposed sale should be approved, citing statements in that same email that the package was already being reviewed *and* understanding that certain items would not be available until closing. HMA disputes this interpretation of the email, insisting that the missing documents were essential to its approval determination, as evidenced by the fact that the July 1 email informed Ziegler that once the missing documents were submitted, they would be included in the package for review.

Given this dispute about what information was reasonably necessary for HMA to approve the sale, it is not possible for the court to determine as a matter of law whether HMA violated the 30-day deadline in the manner that RCD claims, although the fact that HMA had already been aware of its disapproval of a sale contemplating continuation of joint operations would appear to undermine HMA's position *unless* notice to Ziegler alone were sufficient.[15]   Accordingly, the court will grant HMA's motion as to the alleged violation of subsection (a), and deny it as to the alleged violation of subsection (b).

---

[15] Although this last issue was not briefed by the parties, it would appear more a question of law than fact, and may ultimately be for the court to decide.

Further, the court will deny RCD's motion with respect to both of these subsections of § 218.0134(2).

### d. Claim No. 4

Section § 218.0116(1)(s) requires a distributor modifying "a motor vehicle dealer agreement during the term of the agreement" to comply with § 218.0116(8), which in turn requires that the distributor give the dealer "60 days written notice" of any proposed modification that "substantially and adversely affects the motor vehicle dealer's rights" or investment. The 60-day notice period allows the dealer to file a complaint with the state "for a determination of whether there is good cause" for the modification. *Id*. RCD contends that HMA violated these provisions when it refused to make incentive payments under the original terms of the parties' AIP agreement (the enrollment form signed by Bozich) only a few days before RCD was scheduled to close on the sale to Ziegler. HMA raises three challenges to RCD's claims: (1) the AIP agreement does not meet the WMVDL's definition of an agreement; (2) the exclusivity requirement was not a modification because it was included in the AIP from the outset; and (3) HMA notified RCD of modifications to the AIP through a mass email on September 4, 2020, the court disagrees with HMA's first argument and finds genuine issues of material fact prevent ruling on the other two contentions on summary judgment.

### (i) AIP Agreement

The WMVDL defines an "agreement" as "a contract that describes the franchise relationship between manufacturers, distributors, importers and dealers," Wis. Stat.

§ 218.0101(1), and in turn, defines a "franchise" as "the right to buy, sell, distribute or service a line make of motor vehicles that is granted to a motor vehicle dealer or distributor by a manufacturer, importer or distributor," Wis. Stat. § 218.0101(13).  HMA contends that these definitions do not include incentive programs, which merely set forth rules for dealers to earn incentive payments to offset construction costs, as opposed to dealer agreements that describe the foundational aspects of the franchise relationship, including rights and responsibilities with respect to ownership, management, location, and sales.  In support of its argument, HMA cites a decision by the Court of Appeals for the State of Florida, holding under a similar Florida dealership law that an incentive program cannot be considered a franchise agreement or a modification to the franchise agreement because the program falls within the manufacturer's general discretion to set policies and practices for the dealership.  *Recovery Racing, LLC v. Maserati N. Am., Inc.*, 261 So. 3d 600, 605 (Fla. Dist. Ct. App. 2019).

However, as RCD points out, it is unnecessary and inappropriate to look to Florida law when the Wisconsin Supreme Court has already addressed the definitions of "agreement" and "franchise" under § 218.0101, and specifically what constitutes a motor vehicle dealer agreement under Wis. Stat. § 218.0116(8).  Specifically, in *Racine Harley-Davidson, Inc. v. State, Div. of Hearings & Appeals*, 2006 WI 86, ¶ 84, 292 Wis. 2d 549, 596-97, 717 N.W.2d 184, 207, *abrogated on other grounds*, the Wisconsin Supreme Court held that a manufacturer's contractual assignment of territory was an essential aspect of the franchise relationship and, therefore, part of the motor vehicle dealer agreement. Moreover, with respect to the definition of "agreement," the court held that Chapter 218

40

neither requires a written instrument nor "that all terms of the agreement be included in a single instrument designated as the agreement and executed by both parties." *Id.*, at ¶ 80. The supreme court further held that unless an assignment of territory is treated as part of the motor vehicle dealer agreement, § 218.0116(8) will not provide an effective administrative remedy to motor vehicle dealers when a manufacturer modifies their territory. *Id.*, at ¶¶ 87-88 (noting that this result also contradicts the statute's prohibition against provisions in an agreement that waive remedies available to a dealer).

Contrary to HMA's argument, the AIP agreement in this case likewise appears to have had a significantly greater purpose and effect than merely "encourage[ing] dealers to provide customers with new, updated, modern facilities," at least as HMA represents it to be. (HMA Opp. Br., Dkt. #35, at 5.) Indeed, the agreement dictates essential aspects of the Hyundai franchise, most notably requiring participating dealers to upgrade the GDSI standards prescribed in the dealer agreement and adhere to facility exclusivity requirements not contained in the original dealer agreement. Much like a sales territory, branding and exclusivity requirements describe the scope and terms of the franchise relationship between the parties, including what vehicles the dealer is allowed to sell and service, as well as how they may do so. Thus, although the AIP agreement expressly states that it is not part of the dealer agreement and in no way modifies or amends the dealer agreement, it is indeed a binding motor vehicle dealer agreement for purposes of § 218.0116(8), applying the controlling standard articulated by the Wisconsin Supreme Court in *Racine Harley-Davidson.* Further, the fact that Hyundai dealers were not *required* to enroll in the program

41

makes no difference.  Once a dealer chose to enroll, that agreement further described the franchise relationship between RCD and HMA.

### (ii) Modifications and Notice

RCD further asserts that HMA modified the incentive agreement signed by Bozich without proper notice in two ways that substantially and adversely affected RCD's rights: (1) HMA changed *when* dealers would receive the three incentive payments; and (2) HMA changed its facility exclusivity policy with respect to RCD.  The court agrees with RCD's first contention and concludes that there is a genuine issue of material fact as to its second contention.

*First*, with respect to when incentive payments would be made, the January 31, 2020, agreement signed by Bozich states the following:

> In consideration of Dealer's request to participate in the Hyundai Accelerate Brand Program for an exclusive application pursuant to the Agreement, Dealer's agreement to conform all aspects of the designs and standards within, and for Dealer's successful completion of the construction and/or remodeling as determined by HMA's Compliance Review, HMA will provide financial Support Payments to Dealer as follows:
>
> - One percent (1%) Vehicle MSRP less freight reserved by HMA from beginning of facility construction for up to 12 months, *to be paid to Dealer upon full Exclusive GDSI 2.0 Facility branding completion and compliance verification* (the "Construction Accrual Process").
>
> - One percent (1%) Vehicle MSRP less freight *at the time of Certified Compliance with Exclusive GDSI 2.0,* paid for up to 24 months or December 31, 2025, whichever comes first.
>
> - One percent (1%) Vehicle MSRP less freight *for facility exclusivity, as defined by HMA policy,* at time of Certified

> Compliance with Exclusive GDSI 2.0, paid through December 31, 2025.

(Dkt. #21-14, at ¶ 20 (emphases added).)

Bozich interpreted this language to mean that RCD could receive the first two payments upon fully complying with the GDSI 2.0 branding requirements, even if it was not in compliance with the facility exclusivity policy as later defined by HMA policy. HMA disagrees, arguing that *all* three incentive payments require facility exclusivity because each bulleted paragraph references "Exclusive GDSI 2.0." However, the agreement itself does not define the term "exclusivity." Rather, it states that "facility exclusivity" is defined by "HMA policy." Moreover, the first two payments are expressly conditioned on compliance with branding standards set forth in GDSI 2.0, rather than the facility exclusivity policy mentioned in conjunction with the third payment.

In addition, documents included with HMA's September 2020 program relaunch announcement state that HMA made "some modest revisions to the program," including supplementing the program rules "to provide clarity and additional details regarding the Program terms." (Grafton Aug. 31, 2020 ltr., dkt. #21-17, at 3 and 5.) With respect to "payout terms" for payments, the letter stated that "[t]o the extent Genesis still exists in dealer's Hyundai Facility upon the completion of construction, HMA will accrue the Construction Completion Support Payments and the Exclusive Facility Support Payments until Dealer fully complies with the HMA Facilities Usage Policy (Policy 105)." *Id.*, at 5. Thus, even HMA agreed that any previous incentive program documents and the

enrollment agreement did not require, or at least did not expressly state, that dealers must have an exclusive facility to receive any of the three incentive payments.[16]

*Second*, RCD claims HMA repeatedly confirmed and led Bozich to believe RCD's joint Hyundai/Genesis facility was already in compliance with HMA's facility exclusivity policy by labeling the RCD facility as exclusive in the enrollment agreement and compliance checklists, even expressly telling Bozich that no action had to be taken with respect to moving the Genesis franchise *and* failing to correct Bozich's obvious confusion or lack of knowledge about the exclusivity policy.  Although HMA disputes all of this, a reasonable jury could conclude that HMA modified the terms of RCD's incentive agreement when Warner finally informed Bozich in his July 2021 email that RCD could not be considered an exclusive facility as long as the Genesis dealership remained within it.  *See Racine Harley-Davidson*, 2006 WI 86, ¶ 80 (agreement need not be written or included in a single instrument designated as the agreement and executed by both parties). For all of these reasons, HMA's and RCD's motions will be denied as to the § 218.0116(1)(s) claim.

### e.  Claim No. 6

Section 218.0116(1)(bm) prohibits a distributor from willfully failing to comply with any provision in § 218.0101 through § 218.0163.  Here, RCD contends that HMA

---

[16] The next question is whether HMA made this modification with proper notice to RCD.  Because the parties dispute when RCD first learned about the modifications -- either through the September 2020 announcement or through Warner's July 2021 email on the eve of the sale to Ziegler -- this question must be resolved at trial.

willfully violated § 218.0114(9)(a),[17] which prohibits in relevant part any agreement that: (1) "waive[s] a remedy or defense available to a distributor or dealer or other provision protecting the interests of a distributor or dealer"; and (2) "[p]revents a dealer or distributor from bringing an action in a particular forum otherwise available."  In particular, RCD points to ¶ 18 of the AIP agreement, which states that "HMA reserves the right to amend, cancel or revoke the Program and/or Program rules at any time, for any reason, and each participating dealer agrees that it will make no claim to HMA for lost opportunity or anticipated earnings under a cancelled Program or revised or cancelled Program rules." (Dkt. #21-14.)

The court agrees that this broad discretionary language runs afoul of § 218.0116(8)(a), which protects dealers from any modifications substantially and adversely affecting a dealer's rights without 60 days' notice, and also waives RCD's right to bring a claim for lost opportunity or anticipated earnings.  Nevertheless, HMA contends that RCD's claim fails under this provision for two reasons, neither of which are persuasive. *First*, HMA repeats its argument that the AIP enrollment form is not an agreement under the WMVDL, which the court already addressed and rejected in discussing claim no. 4. *Second*, the court finds no merit to HMA's additional argument that ¶ 18 of the incentive agreement does not contain a clear and unambiguous waiver of rights, because it states that RCD will make no claim *to* HMA instead of *against* HMA.

---

[17] As part of this claim, RCD also alleges a willful violation of § 218.0116(8)(a), which the parties discuss primarily in conjunction with Claim No. 4 regarding modifications, as previously addressed in this opinion.

Accordingly, the court will deny HMA's motion with respect to Claim No. 6.  RCD did not make clear in its motion that it was seeking summary judgment with respect to claim no. 6, but any such motion must also be denied because there are genuine issues of material fact as to HMA's conduct and intent.

### 2.  ADDCA Claim No. 7

The ADDCA, 15 U.S.C. § 1222, requires automobile manufacturers[18] to "act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer."  The statute further defines good faith as follows:

> [T]he duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided*, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e).

The parties seem to agree that liability under the ACCDA requires actual or threatened coercion or intimidation, which can be inferred from the defendant's course of conduct, but must include a wrongful demand accompanied by the threat of sanctions for noncompliance.  *George Lussier Enterprises, Inc., v. Subaru of New England, Inc.*, 393 F.3d 36, 44-45 (1st Cir. 2004) (a manufacturer's conditioning of access to vehicles beyond the

---

[18] The parties do not dispute that HMA meets the definition of manufacturer, which includes corporations involved with distribution.  15 U.S.C. § 1221(a).

regular allocation process, without more, does not amount to a "wrongful demand" that would constitute coercion under ADDCA's good-faith requirement"); *see also Colonial Dodge, Inc. v. Chrysler Corp.*, 11 F. Supp. 2d 737, 743 (D. Md. 1996), *aff'd*, 121 F.3d 697 (4th Cir. 1997) (internal citations omitted); *Ed Houser Enterprises, Inc. v. General Motors Corp.*, 595 F.2d 366, 369 (7th Cir.1978); *Buono Sales, Inc. v. Chrysler Motors Corp.*, 449 F.2d 715, 724 (3d Cir. 1971) (noting that "Congress was really trying to reach border-line antitrust violations" by manufacturers).[19]

Even so, courts have consistently held that the ACCDA does not prohibit manufacturers from enforcing just and reasonable contract provisions, even if they appear burdensome.  *See Ed Houser Enterprises*, 595 F.2d at 370-71 (verbal demands were not coercion where defendant had authority to make them under terms of valid agreement); *Coyle Nissan, LLC v. Nissan N. Am., Inc.*, No. 418CV00075TWPTAB, 2021 WL 4295730, at *11 (S.D. Ind. Sept. 21, 2021) (defendant did not act in bad faith in exercising its contractual authority to disapprove and approve sites for new dealer facility).  As with Claim Nos. 1 and 3 under the WMVDL, RCD asserts that HMA used economic coercion to terminate RCD's Genesis dealership by waiting until two days before the closing of the Ziegler sale before conditioning its approval on:  (1) RCD rescinding its Genesis franchise; (2) RCD and Ziegler foregoing Hyundai incentive payments; or (3) the infeasible option

---

[19] In addition, one court in this circuit likened the ACCDA's prohibitions against coercion to those in the WMVDL.  *Mercedes-Benz*, 2010 WL 55473, at *16.  Whether the burden is higher to satisfy the ADDCA's coercion standard than the WMVDL, and in particular, requires something more than "economic sanctions," is not very well developed by the parties' briefing, and may be revisited at the final pretrial conference ("FPTC"), especially as it goes to the language of the jury instructions for RCD's ACCDA claim.

of constructing a new facility.  Because the parties dispute both the specific details surrounding HMA's actions -- including whether that conduct rose to the level of coercion -- and whether approval was granted in a timely manner under § 218.0134(2)(b), the resolution of this claim must wait until trial.  Accordingly, HMA's motion will be denied as to the ACCDA claim.

### 3.  Claim Nos. 9 and 10

#### a.  Intentional Interference with Contract

RCD also claims that HMA tortiously interfered with the Asset Purchase Agreement between RCD and Ziegler because:  (1) Warner had Ziegler sign his own AIP enrollment form, a Genesis incentive participation agreement, and a Genesis EV acknowledgement form; and (2) Warner did this *despite knowing* it would cause the termination of the Genesis franchise, since signing these documents meant that Ziegler was committing to building a new and separate Genesis facility.  However, as HMA correctly points out, RCD has failed to present any evidence supporting its theory, including any plans by Ziegler to actually construct a new facility.  Moreover, the *only* meaningful evidence that Bozich or anyone else at RCD presented about the Keystone program was:  (1) RCD's decision not to enroll in that program in February 2021; and (2) a passing reference to Warner speaking to Ziegler about how the HMA's AIP and GMA's Keystone program would affect his purchase.  Because this evidence is not sufficient to support a separate claim for intentional interference with contract, unless RCD prevails on its independent claim of wrongful coercion under the WMVDL, HMA's motion will be granted as to this claim as it is duplicative, unnecessary and potentially confusing for a lay jury.

### b.  Breach of Contract

Finally, RCD claims that HMA breached the parties' AIP agreement and its implied duty to act in good faith under Wisconsin contract law by refusing to make incentive payments unless the Genesis franchise was relocated or terminated.  The parties' arguments addressing this claim are substantially similar to RCD's claim that HMA improperly modified the AIP agreement under the WMVDL.  For example, HMA argues that:  the agreement required Hyundai facility exclusivity from the outset; HMA validly reserved its right to modify the terms of that agreement; and HMA modified the payout terms of the agreement in September 2020 with proper notice.  However, because the court has concluded that there are genuine issues of material fact related to these issues, neither party is entitled to summary judgment as to the breach of contract claim.[20]

In a final, brief argument, HMA also asserts that the AIP agreement "is not an enforceable contract, in any event," because ¶ 17 of the agreement states that HMA "in its sole discretion, shall have the right to terminate" the incentive program with "no liability whatsoever to any dealer."  (Dkt. #21-14, at ¶ 17.)  However, that argument is not persuasive.  The provision in ¶ 17 goes on to state that HMA's discretion is conditioned on "any federal, state or local law, regulation, or determination by any judicial or administrative body" prohibiting HMA from continuing to operate the program; therefore, HMA does not reserve an unrestricted right not to issue the incentive payments.  *See Don-Rick, Inc. v. QBE Americas*, 995 F. Supp. 2d 863, 871 (W.D. Wis. 2014) ("An illusory

---

[20] To avoid jury confusion, however, the court does again question the purpose of this claim when the WMVDL appears to provide broader protection to RCD than does Wisconsin contract law, but this can be addressed at the FPTC.

contract is unenforceable and arises when contractual promise is 'conditional on some fact or event that is wholly under the promisor's control and [its] bringing it about is left wholly to his own will and discretion.'") (quoting *Nodolf v. Nelson*, 103 Wis.2d 656, 660, 309 N.W.2d 397 (Wis. Ct. App. 1981)).

ORDER

IT IS ORDERED that:

1) Plaintiff Racine Car Dealer, LLC's motion for leave to file an amended complaint (Dkt. #47) is DENIED.

2) Plaintiff's request to voluntarily dismiss its claims under Wis. Stat. § 218.0116(1)(z) and Wis. Stat. § 135.03 is GRANTED WITH PREJUDICE.

3) Plaintiff's motion for partial summary judgment (Dkt. #30) is DENIED.

4) Defendant Genesis Motor America, LLC's motion for summary judgment (Dkt. #28) is GRANTED and GMA is DISMISSED as a defendant.

5) Defendant Hyundai Motor America's motion for summary judgment (Dkt. #19) is GRANTED IN PART as to:  (a) the Wis. Stat. § 218.0116(1)(Lm) claim that defendant failed to comply with the timing requirements in Wis. Stat. § 218.0134(2)(a); and (b) the claim for intentional interference with contract. Defendant's motion is DENIED IN ALL OTHER RESPECTS.

Entered this 8th day of December, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge